IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

JASON D. COOK,                        )
                                      )
                Plaintiff,            )
                                      )
        v.                            )        Case No.
                                      )        15-4145-CV-C-REL-SSA
CAROLYN W. COLVIN, Acting             )
Commissioner of Social Security,      )
                                      )
                Defendant.            )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Jason Cook seeks review of the final decision of the Commissioner of

Social Security denying plaintiff's application for disability benefits under Title II of the

Social Security Act ("the Act").  Plaintiff argues that the ALJ erred in finding plaintiff's

testimony regarding the effects of his impairments not entirely credible.  I find that the

substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is

not disabled.  Therefore, plaintiff's motion for summary judgment will be denied and the

decision of the Commissioner will be affirmed.

## I.    BACKGROUND

On October 10, 2012, plaintiff applied for disability benefits alleging that he had

been disabled since March 1, 2008.  He later amended his alleged onset date to August

17, 2012, the day he stopped working (Tr. at 29, 124).  Plaintiff's disability stems from

Crohn's disease, short bowel syndrome, fistula, chronic fatigue, abdominal pain with

diarrhea and vomiting, possible colon cancer and malnutrition (Tr. at 50, 124).

Plaintiff's application was denied on November 28, 2012.  On March 4, 2014, a hearing

was held before an Administrative Law Judge.  On March 27, 2014, the ALJ found that

plaintiff was not under a "disability" as defined in the Act. On May 7, 2015, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.   STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of

choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III.     BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

    1.     Is the claimant performing substantial gainful activity?

                Yes = not disabled.
                No = go to next step.

2.      Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.      Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.      Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes =  go to next step where burden shifts to Commissioner.

5.      Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV.     THE RECORD

The record consists of the testimony of plaintiff and vocational expert Denise Weaver, in addition to documentary evidence admitted at the hearing.

## A.     ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

## Earnings Record

The record shows that plaintiff earned the following income from 2002 through 2011:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 2002 | $ 3,837.29 | 2007 | $ 0.00 |
| 2003 | 6,275.08 | 2008 | 10,117.00 |

4

|      |           |      |           |
|------|-----------|------|-----------|
| 2004 | 2,848.94  | 2009 | 2,430.83  |
| 2005 | 6,770.76  | 2010 | 15,287.30 |
| 2006 | 394.30    | 2011 | 12,858.00 |

(Tr. at 117).

**Function Report**

In a Function Report dated October 28, 2012, plaintiff reported that he watches television and does small things for his four-year-old daughter. He naps from noon until 3:00 p.m., then visits with his wife and children until he goes to bed around 9:00 or 10:00 p.m. (Tr. at 139). Plaintiff stays at home with his four-year-old and cares for her during the day (Tr. at 140). Plaintiff can care for his personal needs (Tr. at 140), and he prepares his own meals such as sandwiches, fresh meat, potatoes, vegetables, and grain products (Tr. at 141). His cooking depends on what hours his wife works; sometimes she prepares meals (Tr. at 141). When plaintiff cooks, it takes him 35 minutes to an hour (Tr. at 141).

Plaintiff can do laundry and do simple tasks around the house (Tr. at 141). He has to stay near a bathroom and his fatigue causes him to lie down every couple of hours (Tr. at 141). He does not drive because he does not have a driver's license (Tr. at 142). Plaintiff plays his guitar every day for about 20 minutes (Tr. at 143). Plaintiff only goes out to go to the doctor or to go next door to his mother's house (Tr. at 143).

Plaintiff's impairments affect his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks, and use his hands (Tr. at 144). He can walk for 100 yards before needing to rest (Tr. at 144). He has to sit for an hour to build up energy

5

after walking 100 yards (Tr. at 144). He can pay attention "as long as needed." (Tr. at 144). He finishes what he starts, and he can follow directions very well (Tr. at 144).

**Missouri Supplemental Questionnaire**

In this form, dated October 28, 2012, plaintiff reported that he plays video games, puzzles or uses a computer for 20 to 30 minutes at one sitting (Tr. at 148). He had a driver's license, but it was suspended (Tr. at 148). Plaintiff reported that he was not able to complete the form without help -- his wife wrote his answers because his wrist causes him too much pain to write (Tr. at 149).

***B.    SUMMARY OF MEDICAL RECORDS***

On August 17, 2012, plaintiff stopped working. This is his amended alleged onset date.

On August 20, 2012, plaintiff saw Carey Vaughan, D.O., to establish care (Tr. at 195-196). Plaintiff said he had had Crohn's disease[1] since 2008. "Does well on meats, cooked veggies, does bad on raw foods especially w/seeds." For the past two weeks he had been running a fever of up to 102 degrees. Plaintiff reported low back pain and abdominal cramps. Plaintiff reported having lost 60 pounds since February or March of

---

[1]"Crohn's disease is an inflammatory bowel disease (IBD). It causes inflammation of the lining of your digestive tract, which can lead to abdominal pain, severe diarrhea, fatigue, weight loss and malnutrition. Inflammation caused by Crohn's disease can involve different areas of the digestive tract in different people. The inflammation caused by Crohn's disease often spreads deep into the layers of affected bowel tissue. Crohn's disease can be both painful and debilitating, and sometimes may lead to life-threatening complications. While there's no known cure for Crohn's disease, therapies can greatly reduce its signs and symptoms and even bring about long-term remission. With treatment, many people with Crohn's disease are able to function well." http://www.mayoclinic.org/diseases-conditions/crohns-disease/basics/definition/con-200 32061

Case 2:15-cv-04145-REL   Document 27   Filed 09/06/16   Page 6 of 32

2012, and said he had diarrhea constantly. Plaintiff weighed 199 pounds. After performing a physical exam, Dr. Vaughan assessed Crohn's disease, fever of unknown origin, weight loss, diarrhea, and tachycardia.[2] She ordered fasting labs, told plaintiff to increase his sulfasalazine[3] which he had begun taking sometime that year (the month is illegible), ordered a chest x-ray and colonoscopy, and prescribed Atenolol for tachycardia.

On August 24, 2012, plaintiff had a colonoscopy performed by Terry Nold, D.O., due to acute onset of diarrhea with transient bright red rectal bleeding (Tr. at 186). "Patient with prior diagnosis of Crohn's disease diagnosed at the University of Missouri. He has been placed on Azulfidine 1000 mg daily and he has done quite well until recently. He was feeling well and subsequently discontinued his medication." Plaintiff

---

[2]"Tachycardia is a faster than normal heart rate at rest. A healthy adult heart normally beats 60 to 100 times a minute when a person is at rest. If you have tachycardia, the heart rate in the upper chambers or lower chambers of the heart, or both, is increased. Heart rate is controlled by electrical signals sent across heart tissues. Tachycardia occurs when an abnormality in the heart produces rapid electrical signals. In some cases, tachycardia may cause no symptoms or complications. However, tachycardia can seriously disrupt normal heart function, increase the risk of stroke, or cause sudden cardiac arrest or death. Treatments may help control a rapid heartbeat or manage diseases contributing to tachycardia." http://www.mayoclinic.org/diseases-conditions/tachycardia/basics/definition/con-200430 12

[3]Sulfasalazine, also called Azulfidine, is used to treat and prevent ulcerative colitis. It works inside the bowels by helping to reduce the inflammation and other symptoms of the disease. Sulfasalazine enteric-coated tablets are used to treat adults and children with rheumatoid arthritis in patients who have not been helped by or who cannot tolerate other medicines (eg, salicylates or NSAIDs) for rheumatoid arthritis.

was assessed with acute proctocolitis (inflammation of the colon and rectum) with diffuse ulceration and granuloma formation.  He was told to continue Asacol (non-steroidal anti-inflammatory), and he was prescribed Prednisone (steroid) daily for one week with a reduced dosage each week for six weeks.  A repeat colonoscopy was recommended in 8 to 12 weeks.



On September 19, 2012, plaintiff saw Carey Vaughan, D.O., for a follow up (Tr. at 194).  "Has been doing better since he was put on the steroids but he noticed more pain & D since his dose has been reduced. . . .  Still having pain most days."  Plaintiff weighed 190 pounds.  His physical exam was normal.  Plaintiff's dose of Prednisone was continued at 40 mg and he was told to begin to taper it in two weeks.  "Advised to use bone broth and veggie rich soups, probiotics & anti-inflammatory nutrients to get stronger."

On October 10, 2012, plaintiff applied for disability benefits.

On November 15, 2012, plaintiff had a follow up with Carey Vaughan, D.O. (Tr. at 193, 261).  Plaintiff reported still having a lot of pain caused by the fistula[4] and the

---

[4]"Anal fistula is the medical term for an infected tunnel that develops between the skin and the muscular opening at the end of the digestive tract (anus).  Most anal fistulas are the result of an infection that starts in an anal gland.  This infection results in an abscess that drains spontaneously or is drained surgically through the skin next to the anus.  The fistula then forms a tunnel under the skin and connects with the infected gland.  Surgery is usually needed to treat anal fistula."
http://www.mayoclinic.org/diseases-conditions/anal-fistula/basics/definition/con-20032352

left sided colitis (inflammation of the lining of the colon) "still hurts the most." He described his pain as a 5 to 6 out of 10 at its worst. He weighed 182 pounds. His physical exam was normal. Dr. Vaughan assessed severe Crohn's disease, perianal fistula, and proctitis (inflammation of the rectum and anus). Plaintiff was told to take Prednisone at 30 mg for two weeks and then reduce it to 20 mg for 4 weeks, then 10 mg for 4 weeks. He was prescribed Tramadol as needed for pain.

On December 4, 2012, plaintiff saw Roxanne Lim, M.D., after having been referred by Dr. Vaughan (Tr. at 199-201). Plaintiff had last been seen in 2009 after having been diagnosed with Crohn's disease and rectal fistula in 2008. "He was started on Ciprofloxacin [antibiotic] and Flagyl [also called Metronidazole, an antibiotic] for his rectal fistula. He was also started on sulfasalazine for his Crohn's disease. The patient was then lost to follow up. The patient reported he has been doing well since then and discontinued his medications. Symptoms recurred in July 2012 when he started feeling tired as well as having joint pains, weight loss, nausea and vomiting. He has frequent bowel movements but they are nonbloody. He reports that he would also have feces coming out from his rectal fistula." Plaintiff was taking Prednisone and Sulfasalazine. "He reports some improvement in symptoms but continues to be tired. He has joint pains as well as the severe back pain." Plaintiff's Prednisone dose was 30 mg daily, and he had a prescription for Tramadol as needed for pain. Dr. Lim ordered lab work and renewed plaintiff's prescriptions. She also prescribed Flagyl for rectal fistula and ordered further tests.

On December 11, 2012, plaintiff had an MRI of his pelvis (Tr. at 213). Michael Aro, M.D., diagnosed left intersphincteric perianal fistula and small right-sided perianal intersphincteric abscess.

On January 8, 2013, plaintiff saw Jack Bragg, D.O., for a biopsy of the colon (Tr. at 203-212). Plaintiff weighed 175 pounds. He was diagnosed with chronic colitis with mild activity in the right colon, chronic colitis with moderate activity in the left colon, and no evidence of active colitis in the transverse colon (see diagram on page 8). No dysplasia[5] was seen.

On January 13, 2013, plaintiff saw Jack Bragg, D.O., a gastroenterologist, for a follow up on his colonoscopy, blood work, MRI and biopsy (Tr. at 219-222). Plaintiff's tests showed intense erythema,[6] ulcers in the proximal sigmoid colon (see diagram on page 8), ulcers on the IC valve,[7] mild activity re: colitis in the right colon, and moderate activity re: colitis in the left colon. "Upon continuation of my interview with this patient, the patient notes that he does not want to start on biologics[8] at this time as he feels it is poison to his body. He continues to have draining from his fistula and has Flagyl 500 mg t.i.d. [three times a day] which he is currently somewhat compliant on. He may miss

---

[5]Cells that look abnormal under a microscope but are not cancer.

[6]Redness suggestive of active inflammation.

[7]An ileocecal valve is a sphincter muscle valve that separates the small intestine and the large intestine.

[8]Biologics are genetically-engineered proteins derived from human genes. They are designed to inhibit specific components of the immune system that play pivotal roles in fueling inflammation.

a dose here or there.  The patient also continues to have joint pains which he is taking Tramadol for.  He is somewhat compliant with his sulfasalazine as he states that sometimes he forgets doses.  He does have hydrocortisone rectal suppositories; however, he states that he does not like to use these as he does not like to stick them in his rectum."  Plaintiff denied blood in his stools.  Plaintiff weighed 185 pounds.  His physical and mental exam was normal.  He was told to wean off Prednisone from 30 mg to zero by decreasing it 5 mg each week.

On February 19, 2013, plaintiff saw Jack Bragg, D.O., for a follow up (Tr. at 223-225).  "He was last seen here in the clinic on January 15.  At that time he was complaining of a lot of joint pain . . .  We referred him to Dr. Wu, but he did not keep that appointment. . . .  He stated that his bowel function was unchanged.  Fistulas are not draining at the present time.  He is not having any fever or chills, or abdominal pain at this time."  Plaintiff also denied vomiting and denied any side effects from Prednisone.  "He is not bleeding at this time."  Under psychosocial history, the record states, "He is not a smoker.  He does work."  Plaintiff's physical exam was normal.  Dr. Bragg refilled plaintiff's Tramadol as needed for pain.  "I will try to get him to see Dr. Wu again."

On March 21, 2013, plaintiff saw Hazem Hammad, M.D., a gastroenterologist (Tr. at 226-228).  "Jason has been on sulfasalazine 1 gram 4 times a day since his diagnosis in 2008.  He has also required some pain medications intermittently for some peripheral joint pain and abdominal pain.  Lately, he seems to be doing well."  About a week earlier plaintiff thought he had the flu with some nausea and vomiting which had

since resolved. "He currently has 2-3 soft bowel movements every day. No melena[9] or hematochezia.[10] His weight has been stable." Plaintiff had cut his sulfasalazine down to 3 times a day from 4 which had helped with his nausea. He denied vomiting. On exam plaintiff had no tenderness in any joints, no arthritis or joint effusion (fluid in the joint), and no sacroiliac joint tenderness. His exam was normal. Dr. Hammad noted that plaintiff's ulcerative colitis[11]/Crohn's disease "seems to be in clinical remission. He did require a course of prednisone recently for a flare of his symptoms. At this point, I do not think he would need any increase in the dose or additional medication to control his colitis. . ." Dr. Hammad also assessed history of perianal fistula "that seems to be in remission as well. He is not having any pain or discharge from that fistula." Dr. Hammad recommended plaintiff see a rheumatologist for joint pain.

On April 3, 2013, plaintiff saw Celso Velazquez, M.D., a rheumatologist, due to complaints of joint pain (Tr. at 215-218). Plaintiff said he had experienced joint pain since he was 16 years of age. "Notes discomfort in shoulders, elbows, wrists, left

---

[9]Melena is dark sticky feces containing partly digested blood, indicative of bleeding in the upper part of the digestive tract.

[10]Bright red blood in the stool, usually from the lower gastrointestinal tract.

[11]"Ulcerative colitis is an inflammatory bowel disease (IBD) that causes long-lasting inflammation and ulcers (sores) in your digestive tract. Ulcerative colitis affects the innermost lining of your large intestine (colon) and rectum. Symptoms usually develop over time, rather than suddenly. Ulcerative colitis can be debilitating and sometimes can lead to life-threatening complications. While it has no known cure, treatment can greatly reduce signs and symptoms of the disease and even bring about long-term remission."
http://www.mayoclinic.org/diseases-conditions/ulcerative-colitis/basics/definition/con-20043763

Case 2:15-cv-04145-REL   Document 27   Filed 09/06/16   Page 12 of 32

fingers (plays guitar), mid back, knees."  Plaintiff's knee pain was aggravated by walking

up stairs.  Plaintiff rated his pain a 5 out of 10 in severity.  On exam plaintiff had no

swollen or tender joints, normal range of motion in all joints, no sacroiliac tenderness,

good extension in his spine, he could bend over and touch his toes, and he had normal

muscle strength in all limbs.  He had crepitus[12] in his knees and anterior tenderness.

"He does not have any joint swelling.  Pt has nonspecific widespread pain.  Also

appears to have patellofemoral syndrome.[13]  Pt previously treated with Corticosteroids

making AVN[14] a possible etiology of knee pain."  He was assessed with arthralgias (joint

pain) and patellofemoral syndrome.  Knee x-rays were ordered, and he was prescribed

Meloxicam (non-steroidal anti-inflammatory) 15 mg per day.

On May 1, 2013, plaintiff saw Jack Bragg, D.O., for a follow up (Tr. at 231-232).

"Over the last several months his Crohn's has been going downhill."  Plaintiff reported

---

[12]A grating sound or sensation produced by friction between bone and cartilage or
the fractured parts of a bone.

[13]"Patellofemoral pain syndrome is pain at the front of your knee, around your
kneecap (patella).  Sometimes called 'runner's knee,' it's more common in people who
participate in sports that involve running and jumping.  The knee pain often increases
when you run, walk up or down stairs, sit for long periods, or squat.  Simple treatments -
- such as rest and ice -- often help, but sometimes physical therapy is needed to ease
patellofemoral pain."
http://www.mayoclinic.org/diseases-conditions/patellofemoral-pain-syndrome/home/ovc-
20169020

[14]"Avascular necrosis is the death of bone tissue due to a lack of blood supply.  Also
called osteonecrosis, avascular necrosis can lead to tiny breaks in the bone and the
bone's eventual collapse.  The blood flow to a section of bone can be interrupted if the
bone is fractured or the joint becomes dislocated.  Avascular necrosis is also
associated with long-term use of high-dose steroid medications."
http://www.mayoclinic.org/diseases-conditions/avascular-necrosis/basics/definition/con-
20025517

13

having had some nausea, vomiting and abdominal pain.  Bowel movements were nonbloody and every day at least 3 times a day, mostly associated with food.  "He maintains that sulfasalazine has stopped working for him right now."  Plaintiff's exam was normal except he had mild tenderness on the left side of his abdomen.  Dr. Bragg prescribed azathioprine[15] and told him to continue taking sulfasalazine.

On May 29, 2013, plaintiff saw Jack Bragg, D.O., for a follow up (Tr. at 234-235). Since his last visit on May 1, 2013, plaintiff had had a C. difficile[16] study which was negative.  "He is on his fourth week of Imuran treatment and describes improvement in his bowel habits and is now having solid stools, 2-3 times per day.  Additionally his abdominal pain is much improved since the addition of Imuran."  Plaintiff denied melena (see footnote 9 on page 12), hematochezia (see footnote 10 on page 12), nausea, vomiting, and weight loss.  He did report developing fevers in the evening.  Plaintiff rated his pain a 5 out of 10 in severity.  He had not been to see a rheumatologist for joint pain because he said he could not afford it.  Plaintiff's exam was normal.  He was continued on Imuran, but his sulfasalazine was discontinued.  It was recommended that he follow up with rheumatology and get the x-rays that were ordered at his last clinic visit.

On June 19, 2013, plaintiff saw Carey Vaughan, D.O., for a follow up (Tr. at 260).  Plaintiff reported evening fevers, joint pain (for which another doctor had

_____

[15]Also called Imuran, an immunosuppressant used to treat rheumatoid arthritis.

[16]"Clostridium difficile, often called C. difficile or C. diff, is a bacterium that can cause symptoms ranging from diarrhea to life-threatening inflammation of the colon." http://www.mayoclinic.org/diseases-conditions/c-difficile/home/ovc-20202264

prescribed Meloxicam, a non-steroidal anti-inflammatory).  Plaintiff had been out of Atenolol (for tachycardia).  He weighed 158 pounds.  His physical exam was normal.  Plaintiff's Atenolol was refilled.  X-rays were ordered and he was given a referral for a rheumatology consult.

On July 2, 2013, plaintiff saw Carey Vaughan, D.O. (Tr. at 259).  Plaintiff reported decreased appetite.  He had been staying in bed all the time, he had little energy, he was eating twice a day and denied diarrhea but had lost 10 pounds in two weeks.  He weighed 148 pounds.  His exam was normal except he was described as thin, pale, and ill appearing.  He was assessed with uncontrolled Crohn's disease, intermittent fevers and weight lows.  He was started on Prednisone.

On July 12, 2013, plaintiff saw Eston Schwartz, M.D., at Goldschmidt Cancer Center (Tr. at 254-256).  Plaintiff stated that over the past few months he had lost a "huge amount of weight" and had lost over 100 pounds in the past year.  "Jason comes in today stating he has gained about 15-20 pounds back since his visit to the resident clinic.  He is feeling much better.   His fever and chills have [gone] away.  He is more active.  He does not have any more diarrhea and his arthritis has improved."  His performance status was noted to be, "No physically strenuous activity, but ambulatory and able to carry out light or sedentary work, (e.g., office work, light house work)."  Plaintiff's physical exam was normal; he had normal range of motion in his extremities without obvious weakness.  Plaintiff weighed 172 pounds.  Plaintiff's platelet[17] count

---

[17]A small colorless disk-shaped cell fragment without a nucleus, found in large numbers in blood and involved in clotting.

was high. "We did discuss his abnormal CBC.[18]  Since he is quite young and his platelet count has somewhat stabilized around 1.2 million,[19] I have not suggested intervention at this point.  As far as the causes of significant thrombocytopenia,[20] acute and chronic inflammation due to rheumatologic disorders and inflammatory bowel disease can be major causes."

On July 19, 2013, plaintiff saw Eston Schwartz, M.D., at Goldschmidt Cancer Center (Tr. at 251-253).  "Jason comes in today for CBC and bone marrow biopsy.  He states he is unable to stay for a bone marrow biopsy because he left his kids home alone.  He has been feeling great.  He has gained over 10 pounds since last week.  His stools have normalized and he is quite active.  He states he has no acute complaints."  Plaintiff's exam was normal except edema in his legs.  He weighed 181 pounds.  He

---

[18]Complete blood count is a test which measures several components and features of your blood including red blood cells which carry oxygen; white blood cells which fight infection; hemoglobin, the oxygen-carrying protein in red blood cells; hematocrit, the proportion of red blood cells to the fluid component, or plasma, in your blood; and platelets, which help with clotting.

[19]Normal is 150,000 to 450,000 platelets per microliter of circulating blood. http://www.mayoclinic.org/diseases-conditions/thrombocytopenia/basics/causes/con-20027170

[20]"If for any reason your blood platelet count falls below normal, the condition is called thrombocytopenia.  Normally, you have anywhere from 150,000 to 450,000 platelets per microliter of circulating blood.  Because each platelet lives only about 10 days, your body continually renews your platelet supply by producing new platelets in your bone marrow.  Thrombocytopenia can be inherited or it may be caused by a number of medications or conditions.  Whatever the cause, circulating platelets are reduced by one or more of the following processes:  trapping of platelets in the spleen, decreased platelet production or increased destruction of platelets." http://www.mayoclinic.org/diseases-conditions/thrombocytopenia/basics/causes/con-20027170

Case 2:15-cv-04145-REL   Document 27   Filed 09/06/16   Page 16 of 32

was assessed with Thrombocytosis secondary to Crohn's disease, anemia,[21] and slight leukocytosis.[22]  Plaintiff was told to continue taking over-the-counter folic acid and to add an iron supplement.

On August 16, 2013, plaintiff saw Eston Schwartz, M.D., at Goldschmidt Cancer Center (Tr. at 247-250).  "Jason comes in today for follow up.  We do continue to follow his fluctuating CBC.  He states that he has been doing good and his weight has been up.  However, he did not take his prednisone for about a week last week.  He does feel more achy today with pain in his muscles and joints.  . . .  No more diarrhea at this time though."  He reported joint and muscle pains and numbness on his left lateral quadriceps (outside of the thigh) associated with mid to lower back pain.  His performance status was listed as, "No physically strenuous activity, but ambulatory and able to carry out light or sedentary work (e.g., office work, light house work)."  On exam he had abdominal tenderness but his extremities were normal.  He weighed 175 pounds.  Dr. Schwartz assessed thrombocytosis secondary to  Crohn's disease.  He also assessed anemia and directed plaintiff to take over-the-counter iron daily and Folic acid daily, as plaintiff's sulfasalazine causes a decline in folic acid.  "I was under the

_____

[21]"Anemia is a condition in which you don't have enough healthy red blood cells to carry adequate oxygen to the body's tissues.  Having anemia may make you feel tired and weak."  http://www.mayoclinic.org/diseases-conditions/anemia/home/ovc-20183131

[22]"A high white blood cell count is an increase in disease-fighting cells in your blood.  The exact threshold for a high white blood cell count varies from one laboratory to another.  In general, for adults a count of more than 11,000 white blood cells (leukocytes) in a microliter of blood is considered a high white blood cell count.  A high white blood cell count is also called leukocytosis."  http://www.mayoclinic.org/symptoms/high-white-blood-cell-count/basics/definition/sym-2 0050611

17

assumption that this prednisone was short term. However, if it is long term, I have suggested calcium and vitamin D as well as a bone density examination. He has been on it now for 7-8 months and it does not appear that he is coming off of it very quickly. I would be worried about vertebral fractures given the length of this prednisone and the dose."

On August 28, 2013, plaintiff saw Jack Bragg, D.O., for a follow up (Tr. at 237-239). "He currently denies any abdominal pain or diarrhea. Denies any hematochezia [see footnote 10 on page 12]. Has been tolerating all kinds of foods very well." Plaintiff's exam was normal. "As far as his symptoms of Crohn's go, he is doing well. It is hard to say whether his improvement in the symptoms is because of steroids or Imuran." Dr. Bragg recommended plaintiff taper off his prednisone slowly and continue with Imuran.

On September 13, 2013, plaintiff saw Eston Schwartz, M.D., at Goldschmidt Cancer Center (Tr. at 244-246). "Jason returns today for follow up. He does continue to taper his prednisone. He is feeling good and is gaining weight. He has gained about 15 pounds since our last visit. He states he is more active and energetic. He, however, is trying to get disability due to the fact that he was not able to work for so long. He does complain of continued muscle and bone pain at times and weakness in the leg joints." Plaintiff was noted to be "fully active, able to carry on all predisease activities without restrictions." In a review of systems, plaintiff denied nausea, vomiting, diarrhea, change in bowel habits, and GI bleeding. On exam he was found to have no tenderness in his abdomen or extremities. His exam was normal. He weighed 186

18

pounds.  He was diagnosed with thrombocytosis secondary to Crohn's disease.  His platelet count was nearly within normal limits.  Although plaintiff was assessed with anemia, it was noted to be resolved.  Dr. Schwartz recommended plaintiff begin taking iron and folic acid.  He also recommended plaintiff start taking calcium and Vitamin D.

On September 9, 2013, plaintiff saw Carey Vaughan, D.O. (Tr. at 258).  He had been out of prednisone for ten days.  Plaintiff had gained 38 pounds with the prednisone.  Plaintiff's physical exam was normal.  His medications were refilled.

On December 6, 2013, plaintiff saw Eston Schwartz, M.D., at Goldschmidt Cancer Center (Tr. at 240-243).  "Since our last visit, he did see the gastroenterologist at MU.  They have him on Imuran, but he was not able to get in touch with them to refill his prescriptions.  He states that they did check his blood work and they never called him back for refilling his Imuran.  He thinks they want him to continue with that medicine.  Other than that, he is having continued fatigue.  He does not work and does not get out of his house.  His wife states he rarely gets off the couch.  He has no shortness of breath, no nausea, vomiting or diarrhea.  No significant pain except in his abdomen."  During a review of systems, plaintiff reported that he was not on treatment anymore for his gastrointestinal condition.  He denied joint pain, and he had no decreased range of motion in any joints.  He had no tenderness or weakness in his joints.  Plaintiff weighed 185 pounds.  Dr. Schwartz assessed, "Thrombocytosis secondary to Crohn's disease:  Jason's platelet count [10.0] is slightly lower than it was last time, but stable.  He is not on prednisone or Imuran.  He is, however, having symptoms of worsening Crohn's with abdominal pain and diarrhea."  Plaintiff was also

19

assessed with anemia and Dr. Schwartz recommended plaintiff take iron supplements and folic acid. Dr. Schwartz refilled plaintiff's Imuran and recommended he follow up with his GI doctor. With regard to plaintiff's fatigue, Dr. Schwartz ordered blood work which was normal. "This is likely inactivity and I have told him that he needs to start becoming more active."

On January 29, 2014, plaintiff saw Carey Vaughan, D.O., for a follow up (Tr. at 257). Plaintiff reported aching all over, abdominal pain, and vomiting two to three times a week. Plaintiff's weight had been stable. "May get Medicaid soon and has disability hearing in March." Plaintiff weighed 184 pounds. His exam was normal. He was assessed with uncontrolled Crohn's disease. Lab work was ordered.

## C.    SUMMARY OF TESTIMONY

During the March 4, 2014, hearing, plaintiff testified; and Denise Weaver, a vocational expert, testified at the request of the ALJ.

## 1.    Plaintiff's testimony.

At the time of the hearing plaintiff was 28 years of age (Tr. at 29). Plaintiff was living with his wife and three children, 11, 7 and almost 6 (Tr. at 29). Plaintiff has a high school education; he can read, write, and do simple math (Tr. at 29-30).

Plaintiff last worked at Aloha Watersports, his own company, in 2012 (Tr. at 30). Before that he was a dock manager at Aloha Boat (Tr. at 30). Because he was in the boat business, he worked other jobs in the winter (Tr. at 30). He did maintenance at Wal-Mart for a few months, mostly sweeping and doing janitorial work but also fixing shelves or doors (Tr. at 30-31). He worked at Millstone as a hired hand for cleaning

sidewalks and "doing anything they needed done" (Tr. at 31). He worked as a sandwich maker at Quiznos (Tr. at 31).

Plaintiff used to weigh 270 pounds before he got sick (Tr. at 31). He has Crohn's disease and short bowel syndrome (Tr. at 31). He also has arthritis related to Crohn's disease (Tr. at 31). Although he testified that he takes Imuran for Crohn's, "some kind of heart medication" (Atenolol), and doxylamine for upset stomach (Tr. at 31), later when asked if he was taking any medication at all, he answered, "No, sir." (Tr. at 33). When asked about side effects, plaintiff said, "A lot of drowsiness, and not a lot of side effects that I'm aware of, sir." (Tr. at 33).

Plaintiff's Crohn's disease causes vomiting and diarrhea (Tr. at 32). He has a fistula which bothers him a lot when he uses the bathroom (Tr. at 32). He uses the restroom on average five times a day or more (Tr. at 32). After he eats, he has to use the bathroom about 10 or 15 minutes later (Tr. at 32). After he uses the restroom, he has to take a shower because the fistula drains (Tr. at 32). Sometimes he has incontinence; that occurred twice the previous week (Tr. at 32). Plaintiff has arthritis in his knees, elbows, shoulders, and lower back (Tr. at 32).

Plaintiff has not sought medical care in a while; "It's so far of a drive from where we're at, that I was trying to get a closer doctor, to either Lake of the Ozarks or Jefferson City. And insurance is a big deal, too. You know, there's a lot of stuff they would like to do, but haven't done." (Tr. at 34). He applied for Medicaid but was denied because he made too much money (Tr. at 35). Plaintiff was on Prednisone for six months at a time twice, but his doctor only puts him on Prednisone when he gets

"really, really bad" (Tr. at 34-35). Dr. Schwartz wanted plaintiff to go to St. Louis for a possible PET scan because his blood work still shows that he has some sort of cancer (Tr. at 35). His doctor is not sure where the cancer is, so that scan would help figure out where the cancer could be (Tr. at 35-36).

Plaintiff has pain all the time, in his joints and on his left side (Tr. at 36). His fistula also causes pain (Tr. at 36). The only thing he does to relieve pain is go to the bathroom, and that is for the stomach cramps (Tr. at 36). Plaintiff only sleeps two or three hours at a time -- he has night sweats and has to use the bathroom a lot during the night (Tr. at 36).

Plaintiff can walk 100 to 200 feet before needing to sit down (Tr. at 32-33). He can stand in one place for ten minutes at a time before needing to sit down (Tr. at 33). He has a lot of discomfort sitting because of the fistula; he can sit for about 45 minutes at a time (Tr. at 33).

Plaintiff can bathe and dress himself (Tr. at 33). He no longer drives (Tr. at 33-34). He cooks when his wife is working, but only if he has to (Tr. at 34). He stays in bed most of the day or sits on the couch (Tr. at 34). He watches television, usually situation comedies (Tr. at 34).

**2.      Vocational expert testimony.**

Vocational expert Denise Weaver testified at the request of the Administrative Law Judge. Plaintiff's past relevant work at Aloha Watersports is characterized as manager, hotel recreational facilities which includes marinas and water sport type

facilities (Tr. at 38).  The position is DOT 187.167-122, light, with an SVP of 7[23] (Tr. at

38).  He also worked as a dock manager which was described as delivering boats to

customers (Tr. at 38).  The position is characterized as boat rigger, DOT 806.464-010,

medium, with an SVP of 4 (Tr. at 38).  His other jobs are characterized as janitor, DOT

382,664-010, medium, with an SVP of 3, and sandwich maker, DOT 317.664-010,

medium, with an SVP of 2 (Tr. at 38).

The first hypothetical involved a person able to do light work with a sit/stand

option allowing the person to alternate sitting and standing at will provided the person is

not off task by 10% of the work period.  The person could occasionally climb ladders,

ropes, scaffolds, ramps or stairs; stoop; crouch; kneel or crawl.  The person must avoid

all use of hazardous machinery and all exposure to unprotected heights.  Due to fatigue

and pain, the person could only perform simple (SVP level 1 or 2), routine and repetitive

tasks (Tr. at 38-39).  The vocational expert testified that such a person could not

perform any of plaintiff's past relevant work (Tr. at 39).  Such a person could, however,

work as a garment sorter, DOT 222.687-014, light, with an SVP of 2.  There are 27,500

in the country, 715 in Missouri (Tr. at 39).  The person could be a mail clerk, DOT

209.687-026, light with an SVP of 2.  There are 51,250 in the country and 1,890 in

_____

[23]SVP (specific vocational preparation) refers to the typical length of training required
to perform a job.
SVP 1 - Short demonstration only
SVP 2 - Anything beyond short demonstration up to and including 1 month
SVP 3 - Over 1 month up to and including 3 months
SVP 4 - Over 3 months up to and including 6 months
SVP 5 - Over 6 months up to and including 1 year
SVP 6 - Over 1 year up to and including 2 years
SVP 7 - Over 2 years up to and including 4 years

Missouri (Tr. at 39-40). The person could work as a folding-machine operator in a clerical environment, DOT 208.685-014, light, with an SVP of 2. There are 75,500 jobs in the nation and 1,510 in Missouri (Tr. at 40).

The second hypothetical was the same as the first except the person would need two or more unscheduled or unexcused breaks in a workday (Tr. at 40). Such a necessity may "cause a problem with that individual's job" (Tr. at 40).

If the person were absent two or more times a month, he likely would not be retained (Tr. at 40).

## V.  FINDINGS OF THE ALJ

Administrative Law Judge Raymond Souza entered his opinion on March 27, 2014 (Tr. at 12-22). Plaintiff's last insured date was June 30, 2014 (Tr. at 14).

Step one. Plaintiff has not engaged in substantial gainful activity since his amended alleged onset date (Tr. at 14).

Step two. Plaintiff has the following severe impairments: Crohn's disease, short bowel syndrome, irritable bowel syndrome, rectal fistula, ulcerative colitis, and patellofemoral syndrome (Tr. at 14).

Step three. Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 14-15).

Step four. Plaintiff retains the residual functional capacity to perform light work except he must be able to alternate between sitting and standing at will provided he is not off task for more than 10% of the work period; he can occasionally climb ladders, ropes, scaffolds, ramps or stairs; stoop; crouch; kneel; or crawl. He must avoid all

24

exposure to hazardous moving machinery and unprotected heights. He is limited to

simple (SVP 1 or 2), routine, repetitive tasks due to fatigue and pain (Tr. at 15). With

this residual functional capacity, plaintiff is unable to perform his past relevant work as a

hotel manager, boat rigger, janitor, or sandwich maker (Tr. at 20).

Step five. Plaintiff is capable of working as garment sorter, mail clerk, or folding

machine operator, all of which are available in significant numbers in the national

economy (Tr. at 21). Therefore plaintiff is not disabled (Tr. at 21).

## VI.    CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not

credible.

> The ALJ did not mention that Plaintiff used the bathroom five times a day and had to shower each time due to the fistula, that he suffered from incontinence on average two times a week or that he wasn't able to drive.
>
> The ALJ further stated that Plaintiff had not received the type of medical treatment one would expect for a disabled individual and that treatment had been successful in relieving his symptoms and stabilizing his condition. Plaintiff received consistent medical treatment which was remarkable for an individual without medical insurance.
>
> ALJ's decision also mentioned that Plaintiff had not proven that he had explored all possible resources in order to obtain medical services. There is nothing to support that there were resources available for medical services in the area Plaintiff resides. To discount Plaintiff's credibility based on conjecture is unfounded.

(Plaintiff's brief, p. 8).

The credibility of a plaintiff's subjective testimony is primarily for the

Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir.

1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are

25

inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion, and additionally states that the following factors should be considered: Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to

relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board).

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

The claimant's medical record does reflect treatment and some supportive diagnostic testing which reflects that the claimant's alleged conditions are genuine but the objective medical evidence does not support . . . the claimant's subjective complaints regarding the severity, frequency, or residual effects of his digestive disorder. The record reflects that the claimant was diagnosed with Crohn's disease and a rectal fistula in 2008 and improved with treatment such that he discontinued his medications until symptoms reoccurred in July 2012. . . . In September 2012, the claimant reported he has been doing better since he was put on steroids. . . . In December 2012 [he] was seen by Jack Bragg, D.O., a gastroenterologist. . . where he reported some improvement in symptoms but continued tiredness. . . . At a January 2013 follow up with Dr. Bragg it was noted that the claimant did not want to start biologics, was only somewhat compliant with his prescribed medication, and does not use his rectal suppositories as recommended, but had improved Crohn's colitis and was weaned off prednisone. The claimant was referred to a specialist for the treatment of his rectal fistula and possible abscesses but did not keep that appointment. At a February 2013 follow up with Dr. Bragg the claimant reported his bowel function was unchanged and he was not having any fevers or abdominal pain. At a March 2013 visit . . . the claimant reported he was having two to three soft bowel movements a day . . . [and] improved nausea and no vomiting. Dr. Hammad noted that the claimant had previously required a course of prednisone for the acute flare up of symptoms but did not require any additional medication to control his colitis and that his fistula was in remission. The claimant was seen by . . . a rheumatologist in April 2013 for his reported joint pain but his physical examination demonstrated [only] some knee crepitus with anterior tenderness but no swollen or tender joints, no synovitis of any joints, range of motion of all joints within normal limits, normal muscle strength, and full extremity strength. . . . [Recommended] knee x-rays were not performed. In May 2013, the claimant reported his Crohn's disease was worsening and Imuran was added. . . . After just four weeks of using Imuran, the claimant reported that his bowel habits and abdominal pains had improved. . . . In August 2013. . . the claimant denied any abdominal pain, diarrhea, or hematochezia and reported he was tolerating all kinds of food very well. The record does not reflect any subsequent gastroenterologist treatment. In September 2013, the claimant reported to his hematologist that he was feeling good, gaining weight, more active, and more

energetic. . . . At a follow up with his hematologist, he reported continued fatigue but he had no nausea, vomiting or diarrhea. It was also noted that the claimant had not been taking his Imuran. . . . However, he reported to his primary care physician that he was vomiting and having diarrhea. . . . [W]hile supporting the existence of these impairments, the objective medical evidence does not support the claimant's subjective allegations regarding the effects of those impairments on his functioning. . . .

The claimant's self-reported activities of daily living are inconsistent with his allegations of disability. The claimant reported the only problems with personal care are that he bathes more and uses the toilet all the time. The claimant also reported that he could prepare meals, launder, care for his four-year-old, care for his dogs, do simple tasks around the house, do yard work, go outside, ride in a car, play guitar, and play video games. The claimant testified he can dress and bathe himself and on a typical day he sits on the couch and watches situation comedies on television. Based upon the totality of the evidence, the claimant has engaged in substantial activities of daily living; the performance of which are inconsistent with his complaints of disabling symptoms and limitations, but are consistent with the determined residual functional capacity.

A review of the claimant's work history shows that the claimant worked only sporadically with poor earnings prior to the alleged disability onset date, which raises a question as to whether the claimant's continuing unemployment is actually due to medical impairments. Although the claimant's work history is not a determinative factor, his sporadic work and poor earnings do not enhance the credibility of his allegations.

The claimant has not generally received the type of medical treatment one would expect for a disabled individual. The record reveals that the claimant has received specialist treatment, which certainly suggests that the symptoms were genuine. While that fact would normally weigh in the claimant's favor, it is offset by the fact that the record reflects that the treatment was generally successful in relieving the symptoms and stabilizing the claimant's condition. Additionally, although the claimant has received some treatment for the allegedly disabling impairments, that treatment has been essentially routine or conservative in nature. Moreover, the claimant's treatment for his severe impairments has consisted of essentially only prescription medications and the record does not reflect escalating treatment modalities, such as increased frequency of treatment, pain management, emergency room visits, inpatient hospitalization, or surgery to alleviate the claimant's alleged symptoms, which suggests the claimant's symptoms are not as severe as alleged or that the conservative treatment has been relatively effective at controlling his symptoms. The claimant also testified that he has not received further medical treatment due to a lack of

medical insurance benefits. However, an inability to afford medical treatment does not equate to a finding of disability. Furthermore, there is no evidence in this record showing that the claimant explored all possible resources, (e.g., clinical, charitable and public assistance agencies, etc.) in order to obtain medical services, as required by SSR 82-59.[24]

(Tr. at 16-19).

Plaintiff stated he had problems with vomiting and diarrhea. His fistula drains, requiring him to shower five times a day after using the bathroom. He suffers from incontinence twice a week. Plaintiff stated he had arthritis in his joints, including his knees, elbows, shoulders, and lower back area. He thought he could walk 100 feet and stand for 10 minutes. Plaintiff had discomfort with his fistula so he could only sit for 45 minutes. Plaintiff stated he had drowsiness as a side effect of his medication but he was not currently taking any medications. He spends most of his day watching television.

*Joint pains.* Plaintiff's joint pains required nothing more than a low dose of a non-steroidal anti-inflammatory. Plaintiff never followed up on the recommended x-rays, and none of his physical exams revealed anything abnormal beyond knee crepitus. His range of motion was always normal, strength was always normal, and every doctor to examine his joints noted no tenderness, no swelling, no weakness, no fluid.

---

[24]Justifiable cause for failure to follow prescribed treatment includes the following: "The individual is unable to afford prescribed treatment which he or she is willing to accept, but for which free community resources are unavailable. Although a free or subsidized source of treatment is often available, the claim may be allowed where such treatment is not reasonably available in the local community. All possible resources (e.g., clinics, charitable and public assistance agencies, etc.), must be explored."

*Vomiting and diarrhea.* According to the medical records, on December 4, 2012, plaintiff reported that symptoms including vomiting and diarrhea began in July 2012. He was put on medication and his symptoms improved. On February 19, 2013, plaintiff denied vomiting and said his bowel function was unchanged. On March 21, 2013, he reported some vomiting two weeks earlier due to the flu, but it had since resolved. He reported only 2 to 3 soft bowels movements a day, not diarrhea. On May 1, 2013, he reported some vomiting. He did not complain of diarrhea. On May 29, 2013, he denied vomiting, and he reported having 2 to 3 solid stools per day -- not diarrhea. On September 13, 2013, he denied vomiting and diarrhea. On December 6, 2013, he denied vomiting and diarrhea. On January 29, 2014 -- his last medical record -- he reported vomiting 2 to 3 times a week.

Therefore, according to plaintiff's medical records, he was experiencing vomiting in July and August 2012, March 2013 (due to the flu, not his impairments), May 2013, and January 2014. He was experiencing diarrhea in July and August 2012 and December 2013. At all other times during the 18 months of medical records, plaintiff denied vomiting and diarrhea. This is inconsistent with his hearing testimony that vomiting and diarrhea impact his daily life and his ability to sleep at night. It is also inconsistent with an inability to perform any substantial gainful activity due to symptoms of vomiting and diarrhea.

*Fistula.* Plaintiff complained of pain from his fistula in November 2012. The following month he reported feces coming out of his rectal fistula. In January 2013, he continued to have draining from his fistula. However, by February 2013, Dr. Bragg

noted that "fistulas are not draining".  In March 2013, Dr. Hammad indicated that plaintiff's fistula was in remission.  Plaintiff denied any pain or discharge from the fistula.  There is no other mention of a fistula in any of plaintiff's medical records.  Therefore, the symptoms from this condition lasted only a few months which is inconsistent with plaintiff's testimony that his fistula bothers him a lot and requires him to take a shower multiple times a day after using the bathroom due to draining.

*Incontinence.*  Plaintiff testified that he suffers from bowel incontinence twice a week.  Plaintiff never mentioned this condition to any of his doctors.

Although plaintiff testified that he did not seek medical treatment more frequently due to cost and lack of insurance, one can reasonably assume that on those rare occasions when he was able to see a doctor, he would have reported these disabling symptoms had they been occurring.  Furthermore, the record contains no evidence that plaintiff was ever denied medical treatment due to financial reasons; and, as the ALJ noted, there was no evidence in the record that showed plaintiff explored all possible resources, such as clinics, charitable and public assistance agencies, etc. Without such evidence, the failure to seek treatment is a relevant credibility factor.  Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005).  Although plaintiff argues the ALJ improperly considered this factor, the ALJ is entitled to consider plaintiff's lack of treatment under these circumstances when evaluating whether his symptoms were as severe as he alleged.

Plaintiff argues that the ALJ did not consider the fact that plaintiff's cannot drive.  However, the record establishes that plaintiff does not drive because he does not have

a driver's license -- it was suspended (Tr. at 142, 148). This is not a limitation that is related to his impairment and the ALJ was not required to consider it.

As long as substantial evidence in the record supports the ALJ's findings, the court may not reverse the decision even if the case could have been decided differently. Cline v. Colvin, 771 F.3d 1098, 1102 (8th Cir. 2014). Here, I find that the substantial evidence in the record as a whole supports the ALJ's decision to find plaintiff's testimony not entirely credible, and the substantial evidence in the record as a whole supports the ALJ's residual functional capacity assessment.[25]

## VII.  CONCLUSION

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.

_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
September 6, 2016

---

[25]In September 2013, plaintiff's treating doctor wrote that plaintiff was fully active, able to carry on all pre-disease activities without restrictions. This was despite plaintiff indicating he was trying to get disability, "due to the fact that he was not able to work for so long." Dr. Schwartz told plaintiff in December 2013 that his fatigue was likely due to inactivity and he needed to start becoming more active.